## CITY OF HOUSTON v. KITTRELL.[*]
### (No. 8570.)

(Court of Civil Appeals of Texas. Galveston. Dec. 10, 1924. Rehearing Denied Jan. 15, 1925.)

Adverse possession ⬅️114(1)—Evidence held to show plaintiff's predecessors acquired title by limitation.

Evidence *held* to show that plaintiff's predecessors in title held actual and exclusive possession of property in question, claiming title and ownership thereof, and, even though it may have been dedicated to city for street purposes, their adverse possession for ten years prior to 1887, when statute preventing acquisition of title by limitation to streets was passed, vested title in them.

Appeal from District Court, Harris County.

Action of trespass to try title by Norman G. Kittrell, Jr., receiver, against the City of Houston. Judgment for plaintiff, and defendant appeals. Affirmed.

See, also, 264 S. W. 619.

Sewall Myer and W. Ray Scruggs, both of Houston, for appellant.

Atkinson & Atkinson and H. H. Cooper, all of Houston, for appellee.

PLEASANTS, C. J. This is an action of trespass to try title brought by appellee against appellant to recover the title and possession of a small parcel of land in the city of Houston, a part of the John Austin original survey, and fully described in plaintiff's petition.

In addition to the usual general allegations of title, plaintiff specially pleads title under the three, five, and ten years' statutes of limitation.

Defendant's answer contains a general demurrer, general denial, and plea of not guilty.

On the trial in the court below with a jury the trial judge, after hearing the evidence, instructed the jury to return a verdict in favor of plaintiff, and upon the return of such verdict rendered judgment in favor of plaintiff for the title and possession of the land.

The grounds upon which appellant seeks reversal of this judgment are presented by the following propositions:

"Propositions.

"(1) It is error to instruct a verdict for plaintiff where plaintiff's title depends upon supplementary evidence of heirship, possession of deeds, or other supplementary evidence, where the only supplementary evidence in this regard is given by an interested witness.

"(2) The credibility of an interested witness is a matter to be passed upon by the jury, which is not bound to accept his testimony, though it be uncontradicted.

"(3) It is error to admit in evidence a deed or written instrument affecting the title to land where the description is indefinite and, uncertain, and it is not shown that it applies to the land in controversy.

"(4) A deed is inadmissible for indefiniteness where it purports to convey 'all unsold land, etc.,' unless proof is made that the land in controversy was unsold, and that the description is applicable to the land involved.

"(5) Where a deed makes reference to maps and surveys in order to define the land, the deed is inadmissible without the map or survey.

"(6) It is error to instruct a verdict against a defendant for title and possession of land, where plaintiff shows no title.

"(7) A court is not justified in taking a case from a jury when the state of proof is such that reasonable minds might reach different conclusions from the evidence offered.

"(8) It is error to direct a verdict, though there is no conflict among the witnesses where contradictory conclusions might be drawn from the evidence.

"(9) It is error to instruct a verdict against defendant for title and possession of land occupied by a public street, bridge, or viaduct, where there is evidence tending to show a dedication thereof to public use."

We find it unnecessary to discuss or pass upon these propositions separately, since, in our opinion, the undisputed evidence shows title in plaintiff to the land in controversy by limitation, and no judgment other than that rendered by the trial court could have been properly rendered.

Plaintiff sued as receiver for all of the property belonging to Margaret E. and A. C. Allen. The undisputed evidence shows that this property was conveyed to Samuel L. Allen, the husband of Margaret E., and father of A. C., Allen, on May 25, 1853, and that Samuel L. Allen conveyed it to Margaret E. Allen on April 1, 1859. This latter deed, after describing the property by metes and bounds, further describes it as "being the same property now under lease to Peel & Dumble, and

⬅️For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

*Writ of error dismissed for want of jurisdiction March 11, 1925.

occupied by them in the commission and warehouse business." This lease to Peel & Dumble, which sufficiently describes the land, was executed on December 5, 1857, and duly recorded in the records of Harris county on December 12, 1857, leases the land for a period of 10 years from October 23, 1857.

A. C. Allen testified that in 1867 the premises not covered by the Peel & Dumble warehouse were inclosed by a fence; that he remembered such improvements were there something like nine months or a year before 1867. He fixed the date of 1867 by reason of an epidemic of yellow fever, the greatest ever known in Texas, and he further testified that he is the only child of Samuel L. Allen and Margaret E. Allen; that such improvements in the shape of a warehouse remained there, within his knowledge, positively in 1877, and probably until 1879; that his father occupied the premises, or a portion of same, for the purpose of loading water into boats, having a pipe line for the distribution of water running over such premises; that after the warehouse had fallen down his father used said premises for storing drays and wagons thereon, and leased the same to the Texas & New Orleans Railroad, who used it for several years after that, and that he gave his permission afterwards himself for the railroad company to have a watchman's shanty on said property; that from 1867 up until 1912 there was no adverse claim made to the property by any one.

J. R. Toole testified:

"I am 69 years old, and I have lived in Houston all my life, except six months that I was in Chappel Hill. I ran with A. C. Allen in his boyhood days, lived in the Fifth ward close to him. I am acquainted with the property immediately north of the viaduct directly across from the foot of Main street. When I first remember that property there was a warehouse right close to the point run by Peel & Dumble; it was about 100 or 150 feet from the point, and the reason I remember the point was that the steamboats used to turn there. I don't know how many years Peel & Dumble occupied this warehouse, or how long the firm that succeeded them occupied it. That was a warehouse used for cotton, and I suppose it must have been over 100 feet front, and run back south toward the bayou. I guess that warehouse was there about the same time the railroad was, because that was the G. H. & H. that come there at that time and run by the Allen warehouse. Allen had a warehouse right across the track from this one, on the north side of the railroad. I have no way of estimating how long that building stayed on the south side of the railroad. I suppose that building just finally fell down, part of it; I don't know; I don't remember that. There was never any street there from Railroad street down to the bayou, nothing only the G. H. & H. went along to the Central Depot."

Ingham S. Roberts testified:

"From history and otherwise, the railroad came into Houston about 1856 or 1859. The early part of the war they began building the Central Railroad, because during the war the Confederate government built the drawbridge across the bayou. You will find some ordinance prohibiting the railroad from constructing a bridge across Buffalo Bayou, and the Confederate government, about the year 1863, constructed a bridge connecting the H. & T. C. Railway coming down Railroad street with the I. & G. N. Railroad, known as the Galveston, Houston Junction Railroad. From my knowledge of the community, I would say that there was no railroad in operation prior to some time about 1857 or 1858."

H. C. Breaker, a witness put on the stand by the defendant, testified on cross-examination:

"There was a warehouse on block 7 in 1877, but I don't know how long it stayed there, but for some time after that."

We think the only inference that can be reasonably drawn from this testimony, which is wholly uncontradicted, is that the Allens, plaintiff's predecessors in title, held actual and exclusive possession of the property in controversy, claiming title and ownership thereof, and using it for warehouse purposes, for a period of more than ten consecutive years between the years 1857 and 1877. The only shadow of title shown by appellant is the record many years ago of several old maps of the city, presumably authorized by predecessors in title of the Allens, which shows that the property, or a large portion of it, was regarded as one of the streets of the city of Houston. If the property was ever dedicated to the city for street purposes it was never used or attempted to be used by the city or its inhabitants, and no claim thereto was asserted by the city until 1912, when it erected a viaduct thereon. The adverse possession and occupancy by the Allens for more than ten years prior to 1887, when the statute preventing the acquisition of title by limitation to the streets of a city was passed, vested title in them, and there is no evidence or claim that they have parted with such title.

This conclusion as to the effect of the evidence in support of appellee's claim of title by limitation makes a consideration of the several propositions presented by appellant unnecessary. It may be conceded that most, if not all, of these propositions are abstractly sound, but in our view of the evidence none of the rules of law thereby invoked are applicable to the facts of this case. The judgment of the trial court is affirmed.

Affirmed.